# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 39696

————————————

## UNITED STATES
*Appellee*

### v.

## Isaiah L. EDWARDS
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 March 2021

————————————

*Military Judge:* Jefferson B. Brown.

*Approved sentence:* Dishonorable discharge, confinement for 35 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 22 January 2019 by GCM convened at Barksdale Air Force Base, and the United States courthouse, Shreveport, Louisiana.

*For Appellant:* Mark C. Bruegger, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire; Jordan E. Michel (civilian intern).[1]

Before POSCH, RICHARDSON and CADOTTE, *Appellate Military Judges*.

Senior Judge POSCH delivered the opinion of the court, in which Judge RICHARDSON and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

[1] Mr. Michel was at all times supervised by attorneys admitted to practice before this court.

POSCH, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of the murder of another Airman, BH, by means of stabbing and cutting him with a knife, in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918.[2] Appellant was sentenced to a dishonorable discharge, confinement for 35 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises 17 issues on appeal, 3 of which are assignments of error raised through appellate counsel: (1) whether the evidence is factually sufficient to support the conviction; (2) whether the military judge erred by granting a challenge for cause against Captain (Capt) RB; and (3) whether the military judge erred by admitting improper victim impact evidence in sentencing. In addition, Appellant personally raises 14 issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (4) whether the language describing the charged offense unlawfully influenced the panel; (5) whether the evidence is legally insufficient to support Appellant's conviction; (6) whether the military judge erred by admitting Appellant's purported statement that he could kill BH; (7) whether the military judge erred by admitting evidence of Appellant's proficiency with nunchucks; (8) whether the military judge erred by granting the Government's motion *in limine* to exclude testimony from first responders; (9) whether the military judge erred by refusing to compel additional funding for the Defense's forensic psychologist; (10) whether the military judge erred by denying a defense challenge for cause against Capt RK; (11) whether the military judge erred by allowing the Government to play a video of Appellant purportedly sparring with another Airman at work; (12) whether the military judge erred by allowing Senior Airman (SrA) CC to testify that Appellant had a character for untruthfulness; (13) whether the military judge erred by failing to provide a prior consistent statement instruction regarding Appellant's statements to first responders; (14) whether trial counsel made improper argument during findings; (15) whether Appellant is entitled to relief because almost the entirety of Prosecution Exhibit 24[3] is missing from the record of trial; (16) whether the sentence is inappropriately severe; and (17) whether application

---

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Military Rules of Evidence, and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[3] Prosecution Exhibit 24 contained approximately 24 images admitted in sentencing.

of Appellant's mandatory dishonorable discharge is unconstitutional. In addition to these claims, we consider the issue of timely appellate review. With respect to issues (4), (6) through (9), (11) through (13), (15),[4] and (17),[5] we find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

After considering Appellant's assignments of error and issues he personally raises on appeal, we find Appellant's conviction both legally and factually sufficient and no error materially prejudiced a substantial right of Appellant. Thus, we affirm the findings and sentence.

## I. BACKGROUND

BH and Appellant were electric warfare technicians and shared a room when they deployed with other members of their squadron to Andersen Air Force Base, Guam. In the early hours of 27 March 2018, a melee ensued when the two Airmen were alone in their room. When it was over, Appellant had delivered three fatal wounds to BH's neck, along with numerous superficial wounds to his roommate's hands, arms, back, and shoulders.

A suitemate[6] testified he awoke to the sound of someone crying and screaming from the adjoining room, and heard a thud shortly after the screams. As the suitemate went through a common bathroom to investigate, he heard BH shout "Why?" From the vantage of the bathroom door looking into the room, the suitemate saw Appellant lying on top of and facing BH on the ground in a

---

[4] With respect to issue (15), the original record of trial (ROT) contains the entirety of Prosecution Exhibit 24. In response to Appellant's brief raising this issue, the Government's answer states it provided a complete copy of the exhibit to Appellant's appellate defense counsel. The Government's answer further states it "does not oppose Appellant filing a supplemental assignment of error should [Appellant] identify any alleged error in Prosecution Exhibit 24." Appellant did not raise any supplemental issues.

[5] With respect to issue (17), Appellant is incorrect that Article 56(b), UCMJ, 10 U.S.C. § 856(b), attached a mandatory minimum sentence to a conviction for murder. We also note that the military judge did not instruct the members that a mandatory minimum sentence was required in his case, but rather instructed that "this court may sentence the accused to no punishment," and "*may* adjudge either a dishonorable discharge or a bad[-]conduct discharge." (Emphasis added). The sentencing worksheet was consistent with this instruction.

[6] The room BH and Appellant shared was on the second floor of the Andersen Gateway Inns and Suites. The room had a common bathroom with an adjoining room where two other Airmen shared a room. The two rooms and bathroom are considered a suite.

"full mount" position.[7] BH was twisting side to side on his back and blood was coming out of his neck. It looked as though BH was trying to cover his neck with his hands as Appellant pinned his arms or grabbed his hands to stop him. BH died after the suitemate set off to summon help.

At trial, the Prosecution presented the testimony of Appellant's suitemates, first responders, and six special agents of the Air Force Office of Special Investigations (AFOSI) who investigated the homicide. First responders found BH's body on a blood-soaked carpet between the beds, and BH was pronounced dead at 0247. Trial counsel argued the evidence showed Appellant waited at least five to ten minutes, or more, before summoning help by calling 911, and Appellant's actions delayed Security Forces personnel from entering his dorm room. In contrast to the multiple injuries BH suffered, Appellant had just a small cut to his right hand and minor abrasions on his knees. Testimony was also presented that, while searching the room, AFOSI agents found a tooth fragment on the floor. The autopsy of BH revealed a fracture to his right central incisor.

The Prosecution introduced expert testimony in blood-pattern and forensic-DNA analysis, forensic pathology, and martial arts. The forensic pathologist who performed the autopsy identified multiple lacerations to BH's neck, including two cuts to his jugular vein, a gaping wound on the right side of the neck that injured the carotid artery, and a complete transection of the left carotid artery. The left carotid artery was cut "completely across" and was the most significant wound BH suffered, and would have involved heavy bleeding according to the pathologist. Several incised wounds[8] to the throat would have been fatal on their own. There was also an injury to the thyroid cartilage area and the trachea, which the pathologist found would have impaired breathing. Among the superficial wounds on BH's body, the pathologist noted the victim sustained multiple injuries to the hands that were consistent with defensive wounds. BH also suffered several contusions, i.e., bruises, on the left side of the face including two on the forehead, several on the left cheek, the left jaw, one behind the ear, and the left ear itself. Testimony established the bruises could have been caused by a blunt force object striking the victim, or from a fall.

---

[7] The suitemate was familiar with Brazilian jujitsu and explained that a "full mount" position is "like a wrestling position when you are dominant over another person so you can control them."

[8] The forensic pathologist explained, "An incised wound is a wound that is made by a sharp object in drawing across the skin and it is longer on the skin surface or outside surface than it is the deep in the tissue." The expert agreed with trial counsel that an incised wound is "an example of a slicing wound."

Evidence showed that in the weeks leading up to the homicide, Appellant twice participated in conversations about whether individual members of the squadron were capable of taking a life. During a barbecue at his supervisor's lodging in February 2018, Appellant stated that he thought he would be able to kill someone. A similar conversation occurred on the flightline in February or March 2018. The topic came up, "Do you think that you could ever kill someone?" Most of the Airmen took time to respond to the question and confined their affirmative responses to killings they felt were justified in the line of duty or to protect members of their family. In contrast, witnesses recounted Appellant's response that "yes" he could kill was "nonchalant" and spoken without limitation or emotion. At one point, Appellant asked a noncommissioned officer (NCO), "could you just kill somebody just to kill somebody?" and the NCO replied, "No, I don't think I could ever do anything along those lines." Appellant "responded that he thought he could" and then volunteered, "I think I could just kill [BH] in the middle of the night." BH treated his roommate's comment as a joke, raised his hands in the air, and retorted, "There's nothing I can do to stop it."

Appellant testified he killed BH in self-defense using Appellant's knife that his roommate picked up during the altercation. Afraid that BH would stab him, Appellant testified that he pulled his roommate to the ground, disarmed BH of the knife, and then stabbed him with it three times. After Appellant testified, the Prosecution called two Airmen who gave their opinion that Appellant had a character for untruthfulness. BH's mother, aunt and former employer all testified that BH had a peaceful character.

After the close of evidence, the members rejected Appellant's claim of self-defense. They returned a verdict of guilty, finding the Prosecution proved beyond a reasonable doubt that BH was dead as a result of Appellant stabbing and cutting him with a knife, and in doing so, that Appellant had the intent to kill or inflict great bodily harm. In this appeal, we consider Appellant's allegations of error and begin with Appellant's contention that his conviction is legally and factually insufficient.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Appellant's Testimony

Appellant testified in his own defense, admitting he killed BH but in self-defense. After completing his shift around 1900, Appellant said he went to the dorm room he shared with BH, then left to bring back food for them both. When he returned, he flipped open his knife. Appellant made a joke about using it to rob the restaurant where he had gotten the food before putting down the knife

next to BH's chair and eventually going to bed. He testified that he woke up when he felt BH's hand on his buttocks, and then saw his roommate walk towards and enter the bathroom. Appellant explained that they had no arguments, fights or problems of any kind before falling asleep, but the touching made him "really pissed off."

While his roommate was in the bathroom, Appellant sat up in his bed and "was just sort of fuming a bit." He got out of bed and stood in a corner of the room by the switch for the overhead light. After BH went back to bed, Appellant flipped on the light, stood next to his roommate, "and told him to get up." BH did as Appellant asked, and then Appellant hit him on the jaw, immediately knocking his roommate to the floor. Appellant explained that it was his intention to hit BH because that would "sort of make it even."[9] Appellant continued to strike BH in the face with his hands, multiple times, as he stood over him. When his roommate tried to stand up, Appellant "tried to hold him back down," slipped, and pushed BH against a dresser as Appellant fell backwards. Appellant caught himself before nearly falling down, and when he recovered "[BH] was standing in the other direction," "[s]ort of back towards [Appellant]," and BH held Appellant's knife in his left hand.

When Appellant saw his roommate with the knife, they were close enough that BH could have cut Appellant with the blade. Appellant testified he was "really scared" because his roommate "could have stabbed" him. Appellant then seized his roommate's left arm near the wrist, "pulled him down," "jumped on top of him," and struggled to grab ahold of the knife. Appellant testified that once he retrieved his knife he stabbed BH with it three times that he could remember. After delivering the fatal wounds, Appellant mislaid his knife, and held BH's body and hands to the ground because he "did not know where the knife was or what [BH] was trying to do." Appellant testified the fight lasted half a minute from the moment he hit BH to when he stood up. He explained on direct examination that "there was no pausing," and acknowledged he did not "have a lot of time to think about what was going on."

On cross-examination, Appellant admitted he sustained no significant injuries and the abrasions on his knees were rug burns from the carpet in the room. He acknowledged that he competed on a wrestling team in high school and that he lay on top of BH in a "full mount" position, which was "a position of dominance and control." Appellant also acknowledged that he purposefully

---

[9] Appellant testified,

> I was thinking at the time while I was standing up that I was going to hit him and that would sort of make it even, I mean if I would hit him than [sic] I would not have to tell anybody else and he would not have told anybody else and that would have just been the end of it.

pulled BH's hands away as BH tried to cover his neck, but denied doing so to prevent BH from covering up his own wounds. Appellant explained he "was not sure what [BH] was doing with his hands, [and Appellant] was just holding them." Appellant admitted that he had martial arts training while BH did not. He also admitted that he could have run away, through either the front door or the door to the adjoining bathroom. Appellant admitted he cut BH with his knife at least 13 times, and that BH was trying to defend himself and stop Appellant from "slicing him" throughout the struggle. While acknowledging evidence of slicing wounds to BH's neck, Appellant denied using his knife to deliver a deep slicing wound. He acknowledged, however, that he "stabbed [BH] really hard."

After the struggle was over, Appellant washed his arms, tried to go through the adjoining bathroom to get his suitemates, and called 911. Appellant testified he did not recall the order he took these actions, but remembered telling police during a 911 phone call that he "had to kill [his] roommate." Appellant testified he did not want to kill BH. He was afraid that BH would stab him with the knife and believed his actions were necessary to avoid getting hurt.

### 2. Law

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a

reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### a. Murder

As charged, Appellant was convicted of the murder of BH in violation of Article 118(2), UCMJ, 10 U.S.C. § 918(2), which required the Prosecution to prove four elements beyond a reasonable doubt: (1) that BH is dead; (2) that his death resulted from the act of the Appellant in stabbing and cutting him with a knife; (3) that the killing was unlawful; and (4) that at the time of the killing, Appellant had the intent to kill or inflict great bodily harm upon BH. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 43.b.(2).

"Killing a human being is unlawful when done without justification or excuse." *MCM*, pt. IV, ¶ 43.c.(1). Additionally, "[i]t may be inferred that a person intends the natural and probable consequences of an act purposely done. Hence, if a person does an intentional act likely to result in death or great bodily injury, it may be inferred that death or great bodily injury was intended." *MCM*, pt. IV, ¶ 43.c.(3)(a). The intent to kill "need not . . . exist for any particular time before commission of the act, or have previously existed at all. It is sufficient that it existed at the time of the act . . . ." *Id.* "'Great bodily harm' means serious injury; it does not include minor injuries such as a black eye or a bloody nose, but it does include fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, and other serious bodily injuries." *MCM*, pt. IV, ¶ 43.c.(3)(b).

### b. Self-Defense

Self-defense is an affirmative defense to a charge of murder, *see generally* Rule for Courts-Martial (R.C.M.) 916(a) and Discussion, and has two elements. The first element is objective, wherein the accused must have "[a]pprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on" him; and the second element is subjective requiring that the accused himself must have believed that the force used was "necessary for protection against death or grievous bodily harm."[10] *See* R.C.M. 916(e)(1);

---

[10] "Great bodily harm" is synonymous with the term "grievous bodily harm." *MCM*, pt. IV, ¶ 43.c.(3)(b). *See MCM*, pt. IV, ¶ 54.c.(4)(a)(iii) (defining grievous bodily harm).

*see also United States v. Dobson*, 63 M.J. 1, 20 (C.A.A.F. 2006); *United States v. Saulsberry*, 47 M.J. 493, 495 (C.A.A.F. 1998).

The right to self-defense is not available to an accused who "was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." R.C.M. 916(e)(4). Accordingly, "[s]elf-defense is a defense of necessity." *United States v. Curtis*, 44 M.J. 106, 153 (C.A.A.F. 1996), *on reconsideration rev'd per curiam on other grounds*, 46 M.J. 129 (C.A.A.F. 1997). Thus, if an accused "uses force in excess of that believed by him or her to be necessary for defense, he or she becomes the aggressor and is not entitled to this defense." *Id.* at 153 (citing *United States v. Reid*, 32 M.J. 146, 148 (C.M.A. 1991); *United States v. Richey*, 20 M.J. 251, 252 (C.M.A. 1985)). However, an accused who starts an affray is entitled to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *United States v. Dearing*, 63 M.J. 478, 484 n.24 (C.A.A.F. 2006) (citations omitted). The prosecution has the burden of proving beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1).

### 3. Analysis

The trial evidence amply supports the legal and factual sufficiency of the Prosecution's proof that Appellant murdered BH. The record yields proof beyond a reasonable doubt of Appellant's intent to kill and the absence of any lawful reason to excuse the killing of an Airman who witnesses testified had possessed a peaceful character. A rational factfinder may have relied on evidence put forward that BH was a peaceful person and about Appellant's character for untruthfulness to discount Appellant's claim he acted in self-defense.

In the final weeks of BH's life, Appellant made it known that he had the fortitude to take a life as revealed by his plainspoken comments in casual conversations with his peers. Appellant's remarks on the subject of whether any of them were capable of killing someone stand in contrast to the comments made by other Airmen. Unlike the remarks of his coworkers who couched their comments to killings that some felt were justified, Appellant's bravado was at once senseless and particular to his roommate. Appellant volunteered he "could just kill [BH] in the middle of the night," a pronouncement that was at once prophetic and condemning, even while BH and others dismissed it as humor at the time. A rational factfinder could have relied on this comment to find that Appellant's purpose in killing a fellow Airman was to demonstrate his killing bona fides to his peers. *Barner*, 56 M.J. at 134 (every reasonable inference from the evidence of record must be drawn in favor of the prosecution). In the face of evidence that Appellant manifested he could kill his roommate in

the middle of the night, and then did so, the members readily could discount Appellant's testimony of provocation and being threatened with a knife.

In addition to evidence that Appellant entertained the idea that he could kill his roommate, the Prosecution presented evidence that undermined Appellant's stated reason for the killing. A suitemate gave compelling testimony that he woke to the sound of BH's pleas as Appellant took his life. The suitemate heard BH exclaim "Why?" moments before he witnessed Appellant lying on top of his roommate in a position of dominance. The suitemate saw blood was coming out of BH's neck, and it looked as though BH was trying to cover his neck with his hands as Appellant pinned his arms to stop him. Even if the reason for the killing may have vexed the factfinder as it did BH in his last moment of life, the Prosecution was required to prove only Appellant's intent, and not his motive. *United States v. Varraso*, 21 M.J. 129, 134 (C.M.A. 1985). Evidence showed that Appellant did not just stab BH by penetrating him with the knife, he inflicted deep cutting wounds to his neck. The members could infer Appellant's intent not just from Appellant's remarks to his peers a few weeks before the killing, but also because "under the circumstances" BH's "death was so natural and probable a consequence of [A]ppellant's conduct, the members also could have inferred that [A]ppellant wished to achieve this result." *Id.* at 134–35*; see also MCM*, pt. IV, ¶ 43.c.(3)(a).

The genesis of the killing according to Appellant's testimony was unwelcome contact that at once stirred his sleep and anger. However, the Prosecution presented overwhelming evidence that Appellant did not kill BH in self-defense. Considering this evidence along with Appellant's testimony in his own defense, there is no evidence BH manifested any threat of attack or intent to start a fight when, according to Appellant, BH awoke in the early hours of the morning to use the bathroom and then returned to bed. Even if a rational factfinder would credit Appellant's testimony that he felt BH's hand on his buttocks, the defense of self-defense was only available to Appellant if he reasonably apprehended that death or grievous bodily harm was about to be inflicted wrongfully upon him. *Dobson*, 63 M.J. at 20; R.C.M. 916(e)(1)(A). Appellant's testimony about the touching and then watching BH walk towards and enter the bathroom belies any reasonable apprehension.

Even if the factfinder were to credit Appellant's testimony about what happened next, the uncontradicted evidence is that Appellant was the initial, unprovoked aggressor who himself "provoked the attack which gave rise to the apprehension." R.C.M. 916(e)(4). According to his testimony, Appellant told BH to get out of bed and then knocked him to the floor by striking him on the jaw with Appellant's hand. Appellant then stood over BH and struck him several more times in the face. The forensic evidence collected at the autopsy is consistent with this account. In addition to a broken tooth, BH had multiple

bruises on the left side of his face that could have been caused by a blunt force object such as a fist. When BH tried to stand up, Appellant pushed him against a dresser as Appellant lost his balance. There was no evidence upon which members might rely to find that BH, and not Appellant, initiated the combat that led to the killing.

Appellant principally rests his claim of self-defense on the apparent disadvantage he says he found himself in after the unprovoked beating he handed to BH—a use of force that in his words was to "make it even" after the unwelcome touching he claimed had occurred. *But see United States v. Stanley*, 71 M.J. 60, 69 (C.A.A.F. 2012) ("[I]f the accused enters willingly 'into combat with the expectation that deadly force might be employed, he is not allowed to claim self defense.'" (quoting *United States v. Cardwell*, 15 M.J. 124, 126 n.3 (C.M.A. 1983))). According to Appellant's testimony, the next thing that happened was BH picked up Appellant's knife, and Appellant believed that action on his part was necessary to avoid getting hurt because he was afraid BH would stab him with it.

If BH had picked up a knife as Appellant says he did, that act could under some circumstances constitute the unlawful use of deadly force that would justify use of deadly force by Appellant in response. The law of self-defense entitles a person who starts an affray to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *Dearing*, 63 M.J. at 484 n.24 (citations omitted). However, at the point that members might have found that BH held a knife, the members could have found, also, that Appellant had already escalated the level of conflict to one involving the use of deadly force, thereby limiting Appellant's right to use force in self-defense. *See Stanley*, 71 M.J. at 63 (citing *Wallace v. United States*, 162 U.S. 466, 472 (1896)) ("if [the accused] was himself violating or in the act of violating the law—and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self defense, and regulates it according to the magnitude of his own wrong" (internal quotation marks omitted) (quoting *Reed v. State*, 11 Tex. Ct. App. 509, 517–18 (1882))).

The members could have found that escalation was not in issue from evidence of bruises on BH's forehead, left cheek, left jaw, behind the left ear, and the left ear itself, as well as his broken tooth. Our superior court has made clear that deadly force is that which its user "knows creates a substantial risk of death or serious bodily injury to [another]." *Stanley*, 71 M.J. 60, 63 (C.A.A.F. 2012) (alterations in original) (quoting 2 Wayne R. LaFave, Substantive Criminal Law § 10.4(a), at 144 (2d ed. 2003) (citing Model Penal Code § 3.11(2))). A rational factfinder could conclude that injuries Appellant inflicted directly or

in proximity to BH's brain, ears, eyes, nose, and mouth reasonably created a substantial risk of serious bodily injury, and Appellant knew this risk. *See id.* Under the circumstances, a rational factfinder could also have found that only Appellant established the level of force used in the conflict, and did so to such a degree that he no longer retained the right to use deadly force in self-defense.

According to Appellant's account of what happened next, he promptly seized BH's arm and grabbed his knife. After that point, the members could find that any fear of bodily harm Appellant may have had was unreasonable. By Appellant's own testimony, the fatal wounds that caused BH's death happened only when BH was on the ground, weaponless and defenseless. A rational factfinder could conclude that Appellant did not reasonably apprehend that bodily harm was about to be inflicted wrongfully upon him after taking the knife from BH even assuming that there was some evidence of such apprehension when the violence began. Instead, Appellant continued to manifest unprovoked aggression that directly led to BH's death.

A rational factfinder could conclude from the differences in the respective injuries that Appellant's use of force was unnecessary for his own defense. *See, e.g.*, *United States v. Ginn*, 4 C.M.R. 45, 50 (C.M.A. 1952) ("Self-defense is a defensive, not an offensive act; and it cannot exceed the bounds of mere protection of one's self."). The autopsy revealed that BH died from fatal wounds Appellant delivered to his neck. In stark contrast, Appellant suffered only one minor cut to his hand and rug burns on his knees. BH also sustained multiple defensive wounds to his hands. A rational factfinder could reach the same conclusion from Appellant's own testimony that his intent to "sort of make it even" was vigilante justice and not a use of force that was necessary to his own protection.

Viewing the evidence in the light most favorable to the Prosecution, *Robinson*, 77 M.J. at 297–98, we find that a rational factfinder could have found beyond a reasonable doubt that the Prosecution proved of all the elements of murder and disproved Appellant's claim of self-defense. Therefore, the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Thus, we find Appellant's conviction both legally and factually sufficient.

## B. Challenges for Cause: Capt RK and Capt RB

Appellant elected to be tried by a panel consisting of officer members. He contends that the military judge abused his discretion in denying a challenge for cause against Capt RK. He also contends that a second officer, Capt RB,

should not have been excused for actual bias. We consider Appellant's contention as to each member in turn.

### 1. Law

"As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (footnote and citations omitted). Rule for Courts-Martial 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." In furtherance of this rule, our superior court has determined that a member shall be excused in cases of actual or implied bias. *See United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997).

We generally review a military judge's ruling on a challenge for cause for "a clear abuse of discretion." *United States v. Quintanilla*, 63 M.J. 29, 35 (C.A.A.F. 2006). Although we give military judges a "high degree of deference" when reviewing actual-bias-based challenges, implied-bias challenges are analyzed "under a standard less deferential than abuse of discretion but more deferential than de novo." *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002) (citation omitted). "A military judge's determinations on the issue of member bias, actual or implied, are based on the 'totality of the circumstances'" in a particular case. *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (citing *United States v. Strand*, 59 M.J. 455, 456 (C.A.A.F. 2004)). The burden of establishing the grounds for a challenge for cause is on the party making the challenge. R.C.M. 912(f)(3); *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) (citation omitted).

#### a. Actual Bias

"Actual bias is personal bias which will not yield to the military judge's instructions and the evidence presented at trial." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citing *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A. 1987)). Actual bias refers to "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997).

Actual bias is determined not just by a member's response, but also by his demeanor. In excusing members for cause, a trial judge is "applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Wainwright v. Witt*, 469 U.S. 412, 429 (1985). Consequently, "[m]ilitary judges are afforded a high degree of deference

on rulings involving actual bias. This reflects, among other things, the importance of demeanor in evaluating the credibility of a member's answers during voir dire." *Downing*, 56 M.J. at 422.

### b. Implied Bias

Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)). Therefore, appellate courts employ an objective standard when reviewing a military judge's decision regarding implied bias. *Strand*, 59 M.J. at 458. "The hypothetical 'public' is assumed to be familiar with the military justice system." *Bagstad*, 68 M.J. at 462 (citing *Downing*, 56 M.J. at 423).

In reviewing challenges for cause under the implied bias standard, military judges are required to follow the "liberal grant" mandate, which "supports the UCMJ's interest in ensuring that members of the military have their guilt or innocence determined 'by a jury composed of individuals with a fair and open mind.'" *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (quoting *United States v. Smart*, 21 M.J. 15, 18 (C.M.A. 1985)). "[M]ilitary judges must follow the liberal-grant mandate in ruling on challenges for cause, but we will not overturn the military judge's determination not to grant a challenge except for a clear abuse of discretion in applying the liberal-grant mandate." *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993). "[I]n the absence of actual bias, where a military judge considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *Clay*, 64 M.J. at 277.

### 2. Voir Dire and Challenge of Capt RK

### a. Additional Background

During individual voir dire, Capt RK stated that he had specialized training with firearms and some training on police procedures. The extent of his police training involved identifying improperly parked cars. He was a volunteer for the Great Falls (Montana) Police Department but was never deputized, and dealt with nothing more serious than a parking ticket. He held a Master of Science degree in law enforcement intelligence and analysis. However, that course of study did not include any classes about criminal investigation or crime scene preservation. In response to a question about the types of patrols he went on, Capt RK replied that they were "just parking tickets, those kinds of things." When pressed by trial defense counsel about the nature and extent of his training with the police, Capt RK replied that it was "just really procedures with the city of how to park cars that were parked incorrectly."

In an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session that followed individual voir dire, the Defense challenged Capt RK for implied bias. The challenge was directed at Capt RK's experience and familiarity with, and interest in, law enforcement. The Defense explained that Capt RK's master's degree, volunteer work with the police department, and gun ownership indicated an "affinity and ability with law enforcement" that could create doubt in the view of an outside observer about his ability to be fair and impartial. Before ruling on the challenge, the military judge questioned trial defense counsel, asking "if this creates implied bias, is there ever a situation in your mind where a Security Forces member could sit as a court member? [Or] . . . is your position that by virtue of being Security Forces . . . that individual would always [have an] implied bias?" Trial defense counsel responded in the negative. The military judge pressed further, asking what facts in Appellant's case gave rise to the implied bias. Trial defense counsel responded that a substantial part of the Government's case consisted of steps taken by law enforcement.

The military judge denied the challenge for cause against Capt RK on the basis of implied bias, explaining:

> The question comes down to would an objective public observer have a substantial doubt about the fairness of the accused's court-martial panel where a court member remains on the panel who in this case volunteered at a Police Department to[,] I guess[,] write citations or identify cars that were illegally parked. In light of that, the court finds that that implied bias does not exist. [Capt RK's] interactions with police investigations were extremely minimal. There are no discussions of any friendships or interactions with forensic examiners or someone else that might suggest he would have some greater affiliation or have some greater credence as to the testimony of Security Forces as opposed to other witnesses.

The Defense exercised its peremptory challenge against Capt RK, which brought the panel below the five members required for a quorum and made a second round of voir dire necessary. After the second voir dire, trial defense counsel challenged two members for cause, and the military judge granted both. Before assembly, the military judge once more asked counsel for both parties if they wished to exercise a peremptory challenge. Both answered in the negative.

### b. Analysis

Rule for Courts-Martial 912(f)(4) states that "[w]hen a challenge for cause has been denied the successful use of a peremptory challenge by either party,

excusing the challenged member from further participation in the court-martial shall preclude further consideration of the challenge of that excused member upon later review." Because the military judge excused Capt RK through Appellant's use of a peremptory challenge, review of that challenge by this court is precluded.

Even if this court retains the authority to review the denied challenge for cause against Capt RK, the record supports the military judge's finding of no implied bias. Capt RK had limited interaction with members of law enforcement or knowledge of law enforcement procedures. Law enforcement status by itself is not a basis for a challenge for cause. *See United States v. Hennis*, 79 M.J. 370, 388 (C.A.A.F. 2020), *cert. denied*, 2021 U.S. LEXIS 193 (11 Jan. 2021); *United States v. Fulton*, 44 M.J. 100, 101 (C.A.A.F. 1996) (holding member's minimal involvement in security police work was not a per se disqualification from court-martial duty). Reviewing the totality of the circumstances through the eyes of the public to ensure an appearance of fairness in the military justice system, *see United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008), we find the military judge did not err in denying the implied bias challenge against Capt RK.

### 3. Voir Dire and Challenge of Capt RB

#### a. Additional Background

Before trial, Capt RB completed a questionnaire, answering in the affirmative that either he, a family member, or a close friend had been involved in supporting or treating a person accused of a violent crime. Capt RB explained that his cousin had been charged with murder and burglary, and yet this situation "[d]id not affect [Capt RB]." During individual voir dire, he explained that his cousin was convicted of murder and burglary after he entered a residence with an accomplice and stabbed a woman "45 or 49 times" in 2007. His cousin was a year older and their grandmother raised them over the summer and on weekends when they were not in school. He acknowledged that "[a]t the time" when he and his cousin were growing up together, he "was very close personally" to his cousin, and they remained close until his cousin was incarcerated in 2009. The military judge asked about the cousin's sentence after Capt RB disclosed that his cousin had pleaded guilty:

> Q [Military Judge]. Do you know what he was sentenced to?
>
> A [Capt RB]. Two life sentences without parole.
>
> Q. Based on that experience . . . do you have any feelings about how the court system treated your cousin or how he was dealt with?
>
> A. No, sir.

Q. I will ask it a slightly different way. Were you upset with how he was treated in either way by the court system or the police or anyone else?

A. No, sir, to be transparent my parents actually kept me away from the situation.

Capt RB explained that he maintained contact with his cousin after the trial but acknowledged his parents sheltered him from his cousin's situation, and he did not have the opportunity to spend much time with his cousin after he was jailed. Capt RB "tried to keep in contact with [his cousin] to try to do the best [he] can to help him where [he] could." When asked if his cousin's situation impacted him personally, Capt RB replied that he "d[id]n't think it really did, [Capt RB] was going to school when it finally happened and [he] had moved on with [his] life."

Capt RB stated he "did not question" the fairness of his cousin's trial or sentence. He volunteered, "I mean, he stabbed [the victim] like 45 times, he had certain intentions about what he was going to do and according to the law he got what he deserved." In response to a question from trial counsel, Capt RB conceded that he thought about his cousin's case when he first read the charged offense on the flyer at Appellant's court-martial. However, Capt RB did not harbor any feelings about how the court system treated his cousin even though other members of Capt RB's family were frustrated with the way the criminal justice system worked and were also frustrated with his cousin's defense counsel. Capt RB acknowledged that his cousin's situation had a "major impact" on his family, explaining how his cousin "tried to get another lawyer to get him out" after he was sentenced. Capt RB volunteered that "financial stress" was a big part of the family impact. Nonetheless, Capt RB avowed that nothing about his cousin's case would make it difficult for him to be fair and impartial in Appellant's court-martial. He denied harboring concern that he would take any of the information he learned during his cousin's case into deliberations.

Apart from the situation involving his cousin, in group voir dire Capt RB answered affirmatively to a question that was put to the members by trial defense counsel. The question was, "From what you know about our criminal justice system, do any of you believe that our criminal justice system is broken or does not work right?" Later during individual voir dire, and in response to a question by the military judge, Capt RB explained that his response to that question was

> based off of research and we are currently going through the phase of police brutality and things like that when it comes to African-American men and there was some research that came

out about a year ago about the UCMJ and the punishments being greater for certain races and things like that.

Capt RB acknowledged in a follow-up question by the military judge that he had an "interest in looking at racial inequality with both the military justice system as well as the federal and state systems." Trial counsel did not ask any follow-up questions on this topic, but trial defense counsel did ask one:

> Q [Trial Defense Counsel]. Regarding your question and the question that I asked and it was kind of a compound question about whether the justice system is broken or whether sometimes it does not work. Which one of those I guess were you thinking about when you raised your hand, that [it] is just broken or it sometimes does not work?

> A [Capt RB]. I would say that sometimes it does not work. I don't think the system[']s broken, I think that sometimes it[ ] sways.

> Q. Thank you, I have no further questions.

In an Article 39(a), UCMJ, session that followed individual voir dire, the Prosecution challenged Capt RB for both actual and implied bias. The actual-bias challenge was directed at Capt RB's belief that the military's criminal justice system was broken or did not always work. The Prosecution explained that the focus of its challenge was on Capt RB's belief about UCMJ "punishments being unfair based on race" and not the situation involving Capt RB's cousin. Trial counsel further explained, "so our concern would be [Capt RB] bringing that bias back into the deliberation room process."

In the end, the reasons that the Prosecution gave for its implied-bias challenge were most persuasive to the military judge. Trial counsel referred the military judge to Capt RB's knowledge of the effect of his cousin's situation on his family. Specifically, trial counsel explained that Capt RB "has received feedback from the family with regards to how that process went, his [cousin's] interactions with his [cousin's] defense attorneys, and [Capt RB] has opinions on the sentence itself." Additionally, trial counsel shored up his implied-bias challenge, reminding the military judge that Capt RB thought about his cousin's case when he read the flyer and learned that Appellant was charged with murder.

The Defense objected to the challenge to Capt RB, arguing that the Prosecution failed in its burden to establish grounds for a challenge for cause. Trial defense counsel highlighted how Capt RB asserted he was not affected by his cousin's case and was not concerned about the fairness of the sentence. The Defense further noted how the crimes committed by Capt RB's cousin—involv-

18

ing a breaking and entering offense and the murder of a stranger—were dissimilar to those alleged against Appellant, and reminded the military judge about Capt RB's "unequivocal responses" that he could be fair and impartial.

The military judge granted the Government's challenge of Capt RB, but not for implied bias. Instead, the military judge struck Capt RB for actual bias. The military judge gave the following reason for his decision that relied on the grounds that the Prosecution asserted for its implied-bias challenge:

> I am granting [the challenge for] actual bias based on rationale discussions [sic] that the government set forth as to implied bias being an issue. I do not believe that comments [and] observations[ ] regarding the systems being broken [and] punishments not being fair . . . is an actual basis or implied bias. However, [the] reality is . . . that . . . Captain [RB] had a cousin who[m] he is very close with, [and whom] he grew up with, [who] was convicted of [a] stabbing death, and received a sentence. That cousin . . . is attempting to overturn that appeal to the extent that the defense . . . is able to. Captain [RB] mentioned[—]and really it is not surprising[—]that when he saw the charge in this particular case he thought back to what impacted his family and impacted his cousin and under those circumstances [and] to no fault of Captain [RB] it is hard to imagine a situation or circumstances where he would not reflect his own personal experiences and [his] family's own personal experiences into this case as presented. As for those reasons I grant the challenge for cause as for Captain [RB] based upon actual bias.

The military judge did not provide any comments explicitly addressing his observations or conclusions regarding Capt RB's demeanor.

### b. Analysis

As an initial matter, we do not question the military judge's ruling that Capt RB's belief that the military's criminal justice system was broken or did not always work was an insufficient basis to strike Capt RB on grounds of actual or implied bias. Capt RB said that he would follow the military judge's instructions and would fairly and impartially decide Appellant's case. We find no reason to conclude that a finding or sentence that Capt RB concluded was appropriate would have been improperly influenced by his observations of UCMJ "punishments being unfair based on race" as trial counsel claimed that he might. And, we are disinclined to find implied bias founded in legitimate

public scrutiny of a military justice system that the Government itself administers and controls.[11]

In contrast to his ruling on the implied-bias challenge, the military judge's actual-bias finding is a close call. Among other things, Capt RB disclaimed prior knowledge of the facts or events in the case. None of his answers conveyed that he would not "yield to the military judge's instructions and the evidence presented at trial." *Nash*, 71 M.J. at 88. Additionally, the military judge's ruling did not address Capt RB's demeanor during voir dire. *See Downing*, 56 M.J. at 422 (explaining high deference on rulings involving actual-bias challenges reflects "the importance of demeanor" in evaluating a member's answers during voir dire). The crux of Appellant's argument on appeal is that the military judge erred because the Prosecution "observed the entirety of Capt RB's voir dire and did not believe his answers or demeanor, with respect to his cousin's conviction and sentence, represented actual bias." Additionally, Appellant claims that the military judge's supporting rationale for his ruling was erroneous. Appellant argues that "[w]ithout any such credibility assessment, the totality of the circumstances indicates that Capt RB truthfully answered questions regarding his feelings on his cousin's case, and that he could be fair and impartial as a panel member." In this regard, Appellant essentially makes three points, which we address in turn.

First, Appellant contends that the military judge's conclusion that Capt RB "had a cousin who[m] he is very close with" is not supported by the record. In response to a direct question by the military judge about whether he was "very close personally" to his cousin, Capt RB stated "[a]t the time yes, sir." When pressed to clarify the phrase "at the time" and whether his relationship with his cousin changed, Capt RB indicated that they still stayed in contact but they did not have an opportunity to spend time together. Appellant observes that Capt RB never stated how often he was in contact with his cousin or if they shared any close connection at all. Also, Capt RB never referred to his cousin by name, and initially referred to his cousin during individual voir dire as "[m]y mom's brother's son." Adding credence to Appellant's point, we note that Capt RB stated that his family sheltered him from his cousin's situation and that it would not affect him personally because he "had moved on with [his] life."

---

[11] Before ruling, the military judge correctly observed, "As an initial matter the court is aware there is not a mandate to liberally grant government challenges." *See United States v. Howard*, No. ACM 36466, 2008 CCA LEXIS 234, at *6 (A.F. Ct. Crim. App. 25 Jun. 2008) (per curiam) ("There is no basis for the application of the 'liberal grant' policy when the military judge is ruling on a government challenge for cause." (citing *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005))).

In contrast to Appellant's contention that Capt RB provided no indication that he still maintained a close relationship with his cousin, the Government argues in this appeal that

> Capt RB's statements during voir dire established that his relationship with his cousin was more similar to that of a brother than a cousin. They spent summers and weekends together, and were essentially jointly raised by their grandmother. They remained in contact even after his cousin's incarceration, which occurred less than ten years before Appellant's court-martial. Capt RB thought of his cousin's case, which also involved a murder by stabbing, after reading the flyer in Appellant's case. Having spent essentially his entire adolescence growing up alongside his cousin, the military judge's finding that they were "close" was not clearly erroneous and is supported by the record.

We agree with the Government that the military judge did not abuse his discretion on this point. Although the military judge could have reached a different conclusion, it was not an abuse of discretion to find that Capt RB remained close to his cousin. He stated that after his cousin's incarceration he "tried to keep in contact with [his cousin] to try to do the best [he] can to help him where [he] could." This response suggests that the cousin's incarceration limited, but did not sever, a fraternal bond with Capt RB.

Second, and related, Appellant claims that the military judge "erred when he concluded how much Capt RB's family was impacted by his cousin's crimes." We disagree, but at the same time we find few signs that Capt RB was actually influenced by the views of his family or a particular family member. In contrast to the "major impact," including financial stress, that his cousin's sentencing had on Capt RB's family, Capt RB did not include himself among those who were affected, and affirmed that nothing about his cousin's case would make it difficult for him to be fair and impartial in Appellant's court-martial. Nonetheless, the military judge's finding that when Capt RB first "saw the charge in this particular case he thought back to what impacted his family and impacted his cousin" is supported by the record.

Third, Appellant contends that the military judge's ruling misjudged how Capt RB's "own personal experiences" might affect his impartiality. By far, this is the closest and most significant call that the military judge made. In support of Appellant's point, we note that Capt RB informed the military judge about his cousin's "[t]wo life sentences without parole" and that "according to the law he got what he deserved." Capt RB volunteered that he "did not question" the fairness of the sentence. Nonetheless, it is a fair inference that Capt RB would "reflect his own personal experiences and [his] family's own personal experi-

ences into this case" as the military judge determined in his ruling. This conclusion is supported by the concern that his cousin had been prosecuted for a similar offense, and Capt RB had responded affirmatively to the question whether he had lent support to a person accused of a violent crime. Also, in response to the question, "How did [his cousin's situation] . . . impact [him] personally" he replied, "I can't really—I don't think it really did."

The Government argues that even if Capt RB had not been excused for actual bias, "this is a case in which the military judge could have still excused the member under an implied bias standard." We agree and find the military judge's reasons for finding actual bias established grounds for implied bias. "[W]here actual bias is found, a finding of implied bias would not be unusual, but where there is no finding of actual bias, implied bias must be independently established." *United States v. Dockery*, 76 M.J. 91, 98 n.6 (C.A.A.F. 2017) (quoting *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007)). In particular, Capt RB's comment that he did not think that his cousin's situation had any impact on him indicated he lacked personal insight because other responses he gave indicate he reasonably should have been affected. Notably, Capt RB indicated that he tried to keep in contact with his cousin whose conviction and sentence was the source of significant family distress.

Even if the military judge erred in granting the Prosecution's challenge for cause against Capt RB, that error was harmless. When a military judge erroneously excludes an unbiased member of the panel, an appellant must demonstrate the panel that ultimately heard his case was not impartial or fair. *United States v. Dockery*, 76 M.J. 91, 99 (C.A.A.F. 2017). Like the appellant in *Dockery*, Appellant has not shown that any of the panel members who tried him were biased or that their presence on the panel created substantial doubt as to the court-martial's "legality, fairness and impartiality." *See id.* at 99 (quoting R.C.M. 912(f)(1)(N)). Although the military judge's finding of actual bias was a close call, we find no prejudice to Appellant from the exclusion of Capt RB from the panel.

## C. Challenges to Trial Counsel's Findings Argument

Appellant contends that trial counsel engaged in improper argument during his findings argument, including rebuttal. We consider Appellant's claim that trial counsel twice misstated evidence and twice improperly shifted the burden of proof. We find the complained-of comments and the argument as a whole did not materially prejudice a substantial right of Appellant.

### 1. Law

Prosecutorial misconduct and improper argument are questions of law that we review de novo. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)). When there is

no objection at trial, we review for plain error. *See id.* (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005); *Sewell*, 76 M.J. at 18). "The burden of proof under plain error review is on the appellant." *Id.* (citation omitted). To prevail under a plain error analysis, an appellant must show "(1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179).

"The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). When an improper remark is alleged to be of constitutional dimension, it must be evaluated in the context of the overall record and the facts of the case. *See United States v. Webb*, 38 M.J. 62, 65 (C.M.A. 1993) (citation omitted). The United States Supreme Court has observed that "it is important that both the defendant and prosecutor have the opportunity to meet fairly the evidence and arguments of one another." *United States v. Robinson*, 485 U.S. 25, 33 (1988). A trial counsel is permitted to make a "fair response" to claims made by the defense, even where a constitutional right is at stake. *Id.* at 32.

In assessing prejudice when we find error, we evaluate the cumulative impact of any prosecutorial misconduct on an appellant's substantial rights and the fairness and integrity of his trial. *Fletcher*, 62 M.J. at 184 (citation omitted). We do so by balancing three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* We also recognize that the lack of defense objection is some measure of the minimal prejudicial impact of the trial counsel's argument. *See United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (citation omitted). In sum, our superior court has found "reversal is warranted only 'when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *Sewell*, 76 M.J. at 18 (quoting *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014)).

### 2. Analysis

#### a. Alleged Misstatement of Evidence

"A trial counsel is charged with being a zealous advocate for the Government." *United States v. Barrazamartinez*, 58 M.J. 173, 176 (C.A.A.F. 2003) (citation omitted). He may argue not only the evidence that is within the record, but also "all reasonable inferences fairly derived from such evidence." *Baer*, 53

M.J. at 237 (citation omitted). The court does not review a comment in isolation, but the rather the entire argument "viewed in context." *United States v. Young*, 470 U.S. 1, 16 (1985); *Baer*, 53 M.J. at 239.

Appellant contends that trial counsel misstated evidence by arguing that Appellant took between five and ten minutes before calling 911 to get help for BH after he stabbed him. Once Appellant's suitemate discovered Appellant lying on top of BH, the suitemate woke his roommate and the two jogged to the lodging office to summon help after realizing that they did not know how to call 911 themselves.[12] The lodging manager testified "[i]t was around 0215 in the morning" when the Airmen arrived at the front desk and alerted her to the emergency, which prompted her to initiate phone calls to Fire Dispatch and Security Forces. Appellant twice called 911 from his dorm room. The first phone call was placed at 0222 and sounded "like some sort of stuttering, but it was inaudible," according to the AFOSI agent who listened to the recording. Appellant's second call was placed at 0223, at which time Appellant told the dispatcher, "I had to kill my roommate."[13]

Among the facts that showed Appellant intended to kill BH, trial counsel argued that Appellant purposefully waited to call for help:

> Conservatively, at least 5 maybe 10 minutes maybe more, but he has all of that time alone in that room. And he has time to think and he has time to go to the closet,[14] [but Appellant does] not knock on the door, not make any noises, not yell out for his . . . suite-mates . . . .

Because trial defense counsel did not object to this argument we review for plain error. We disagree with Appellant that trial counsel improperly argued that Appellant waited for five to ten minutes, or more, before calling 911. The record demonstrates that the lodging manager called first responders several minutes before Appellant's first 911 phone call. Further, the record shows that additional time elapsed between the attack and the night manager's phone calls, as the suitemate had to wake his roommate, explain the situation, briefly

---

[12] The suitemate's roommate testified "[w]e were going to call the cops but we did not know the number." There was "a number that we had to dial before 9-1-1," and neither knew it.

[13] The military judge initially excluded Appellant's statement during the second phone call to 911, which was offered by Appellant, finding it was hearsay and not within any exception. After trial counsel cross-examined Appellant about statements he made to first responders, the military judge ruled that the Defense was permitted to introduce the 911 recording under the rule of completeness, Mil. R. Evid. 304(h).

[14] Both when questioning Appellant and in findings argument, trial counsel referred to the common bathroom between the rooms as a bathroom "closet."

discuss how to call emergency services, jog to the lodging manager's desk, and then explain the situation to her before the first call was made. Under the circumstances, it is a fair inference that Appellant waited at least five to ten minutes before calling 911. *See Baer*, 53 M.J. at 237. Thus, Appellant has not shown that trial counsel erred in misstating evidence.

Appellant claims trial counsel misstated evidence a second time when he argued in rebuttal that Appellant cut his hand when he fell on the bed after attacking the victim. As relevant to Appellant's claim, Appellant acknowledged on cross-examination that there was a cut to his hand, but was not asked by either counsel about the cause of Appellant's injury. Trial counsel asked, "Do you remember *when* that happened" and Appellant replied, "No, sir." (Emphasis added). Trial counsel's questioning also included this exchange:

> Q [Trial Counsel]. You had no injuries to your face?
>
> A [Appellant]. No, sir.
>
> Q. Or really on the rest of your body from [BH], correct?
>
> A. No, sir.

During rebuttal argument, trial counsel erroneously argued that Appellant had testified that he cut his hand on the bed, thereby implying that the evidence showed that Appellant's injury was not a defensive wound. He argued:

> [T]his cut was caused by his bed. Upon the stand during direct examination it happened so fast, counsel asked him a question about him falling backwards, you remember when he talked about falling back into a bed so when he fell back *he said he cut his hand. He cut it on the bed*, and you are all in a great position because one of the benefits of the military court system is that you, like defense counsel said, you can request to hear that particular piece of testimony. Queue it up, we will play it for you because there is no evidence that he in his own words to tell you that the knife did not cut him. Not only did he say that, he said his hands were cut by the bed. Play the tape, it is there, it is during his direct examination, queue it up.

(Emphasis added).

During their deliberations, the members asked to hear "any references" about how Appellant "cut his hand . . . during his testimony if any." In response to this query, portions of the record were replayed, which included this exchange that Appellant claimed occurred before he stabbed the victim:

> Q [Trial Defense Counsel]. Where did you hit him?
>
> A [Appellant]. On his jaw.

Q. What happened when you hit him?

A. He went sort of straight down and I was just standing on top of him hitting him.

Q. What happened after that?

A. I was over him hitting him and when he got back up, I tried to hold him back down, but I sort of slipped and it turned into sort of a push and I pushed him onto the dresser and I slipped backwards over the bed.

Q. When you slipped backwards over the bed, did you fall to the ground?

A: No, sir, not completely, *I kind of caught myself*.

(Emphasis added). After that, Appellant testified he "pushed" himself "directly back up in front of" BH who was standing with his back towards Appellant and was now holding Appellant's knife in his hand. Appellant testified that he grabbed his roommate's wrist and pulled him to the ground, "jumped on top of him," retrieved his knife, and then stabbed BH three times.

Because trial defense counsel did not object to this argument we again review for plain error. We agree with Appellant that trial counsel improperly argued that Appellant said he cut his hand when he fell on the bed. However, the record suggests trial counsel did not intentionally misstate evidence, but rather misheard Appellant's testimony. Appellant testified that he slipped and "caught" himself on the bed, which trial counsel apparently misheard as "I kind of cut myself."

However, even if the error was clear or obvious, we find no prejudice to Appellant. The members heard the evidence, and relevant portions of the record were replayed when the members questioned the correctness of trial counsel's argument. Without knowing he was doing it, trial counsel provided his own curative measure for his misstatement, when he told the members to re-listen to Appellant's testimony. Also, the military judge instructed the members to "[b]ear in mind that the arguments of counsel are not evidence." In assessing the severity of the misstatement, curative measure, and weight of the evidence, *see Fletcher*, 62 M.J. at 184, we find no prejudice under a plain error standard of review.

### b. Alleged Burden Shift to Appellant

The Government always has the burden to produce evidence on every element and to persuade the factfinder of guilt beyond a reasonable doubt. *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995) ("The Due Process Clause of the Fifth Amendment to the Constitution requires the Government to prove

a defendant's guilt beyond a reasonable doubt." (citation omitted)). This burden never shifts to the Defense, and the Government "may not comment on the failure of the defense to call witnesses." R.C.M. 919(b), Discussion; *see United States v. Mobley*, 31 M.J. 273, 279 (C.M.A. 1990) (citation omitted). A trial counsel's suggestion that an accused may have an obligation to produce evidence of his own innocence is "error of constitutional dimension." *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004) (citation omitted).

Near the end of the Prosecution's findings argument, trial counsel explained why the members should question Appellant's testimony that he acted in self-defense. He argued that Appellant said nothing in the 911 phone call about the victim touching him inappropriately or that the reason he stabbed the victim was because the victim held a knife. Instead, trial counsel suggested that Appellant invented these facts and argued that Appellant had nine months to plan a story to tell during his trial testimony:

> This new story emerges and again he is saying these statements clearly and calmly. All of this time to think and again[,] too[,] his story develops. *No other witnesses*. [BH] is dead. You have character evidence. Again, for self-defense to apply *if you don't believe what he is telling you that he is guilty*.

(Emphasis added).

At this point, trial defense counsel objected, based upon burden shifting. In response, and without ruling on the objection, the military judge immediately instructed the members that:

> I have instructed you numerous times and you will also see it in writing as well, [that the] government does have the burden of proof and that will never shift to the defense. I believe it will be clear but if for some reason there are any questions or concern about that please let me know. I have no concern that the government was attempting to argue otherwise[.] I will allow [trial counsel] to finish argument.

Trial counsel then continued with argument, maintaining that the Prosecution had shown "that self-defense does not apply by proof beyond a reasonable doubt because [Appellant's] story does not add up. He did not have to testify, he has no burden to do anything, but he took the stand, he took the oath, and he said things that are just not true."

To the extent that trial counsel argued that Appellant was not entitled to the defense of self-defense if the members disbelieved Appellant's account of the killing, we find no error. It is one thing to state or imply that an accused carries a burden of proof, which is prohibited, and quite another to "offer[ ] a comment that provides a fair response to claims made by the defense," which

is allowed. *See United States v. Lewis*, 69 M.J. 379, 384 (C.A.A.F. 2011) (quoting *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (applying the "invited response" or "invited reply" doctrine)). When Appellant chose to testify, he opened up his credibility to attack just like any other witness. Trial counsel did not improperly argue that if the panel disbelieved Appellant's claim of self-defense, then there was no right of self-defense and he was guilty of murder.

Even if trial counsel's "[n]o other witnesses" comment was intended or understood in isolation to rebuke Appellant for calling no witnesses to substantiate his defense, which is prohibited, this single statement "must be examined in light of its context within the entire court-martial" before we find it was improper. *Id.* (quoting *Carter*, 61 M.J. at 33). This comment instead could be understood as arguing that Appellant fabricated a story, which conveniently involved no witnesses who could challenge his testimony. Regardless, after the military judge's *sua sponte* curative instruction that the burden of proof never shifts to the defense, trial counsel immediately echoed that instruction, adding that Appellant had no obligation to testify, "ha[d] no burden to do anything," and that the Prosecution had "proven that self-defense does not apply by proof beyond a reasonable doubt." Thus, considering the context of trial counsel's argument, Appellant has not established error, much less prejudice.

A second example of burden shifting Appellant alleges is a statement that trial counsel made in rebuttal argument in response to a comment by the Defense about forensic testing of swabs that AFOSI agents obtained from the scene. The root of Appellant's contention begins with the testimony of the Government's DNA expert who acknowledged on cross-examination that more than 100 swabs were not tested. On redirect, trial counsel introduced unchallenged testimony that the Defense had not asked for additional testing:

> Q [Trial Counsel]. So, . . . there were more than 100 swabs that were not tested? . . . Ma'am, can defense request additional testing of the swabs?
>
> A [Expert Witness]. Yes, they can.
>
> Q. Would you have done that additional testing if they requested it?
>
> A. We would have, yes.
>
> Q. Did you ever receive any of this type of request from defense?
>
> A. Not to my knowledge and I would say that this request would come through our evidence processing branch and they would determine whether it was necessary to be tested. Usually in most cases we would be open to testing something for the defense.

In closing argument trial defense counsel argued there was reasonable doubt of Appellant's guilt because the Government performed forensic testing on just 15 percent of the swabs. In rebuttal argument, the Prosecution brought up the Defense's failure to request DNA testing on swabs that AFOSI agents collected from the scene. Trial counsel argued, "The additional swabs, members, they did not have to do anything, they did not have to put on any defense, they could have requested all of those other swabs be tested." Trial defense counsel objected to that argument on the basis of "burden shift." The military judge again instructed the members, "I have already advised you regarding the government maintaining the burden."

We are not persuaded that trial counsel shifted the burden of proof to the Defense when he told the panel that the Defense had the opportunity to request additional DNA testing. "It is well established that the government may comment on the failure of a defendant to refute government evidence or to support his own claims." *United States v. Flores*, 69 M.J. 366, 371 (C.A.A.F. 2011) (quoting *United States v. Coven*, 662 F.2d 162, 171 (2d Cir. 1981)). And as discussed, trial counsel is not "prohibited from offering a comment that provides a fair response to claims made by the defense." *United States v. Carter*, 61 M.J. at 33 (citations omitted). When considering the propriety of a prosecutor's argument, an appellate court "must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12 (1985).

Here, the trial defense counsel argued that the Government failed to test evidence that could have been helpful to Appellant. In context, trial counsel was not arguing that the Defense has the burden of presenting exculpatory DNA evidence. Rather, he was rebutting the Defense's implication that untested swabs raised reasonable doubt and should be held against the Government. "We note there is a difference between trial defense counsel arguing missing evidence as it applies to the Government meeting its burden of proof and arguing the members should make a negative inference from evidence not properly before them as the trier of fact." *United States v. Vorhees*, No. ACM 38836, 2016 CCA LEXIS 752, at *29 (A.F. Ct. Crim. App. 23 Nov. 2016) (unpub. op.). Here, additional DNA testing was within Appellant's power to request. Thus, considering the context of trial counsel's argument, together with the prophylactic instruction given by the military judge that cabined trial counsel's comments, we find that Appellant has not established error.

## D. Sentencing

Appellant claims the military judge erred in admitting improper victim impact matters under R.C.M. 1001A at the sentencing hearing.

## 1. Additional Background

The military judge appointed BH's father as legal representative for the purpose of assuming BH's rights under Article 6b(c), UCMJ, 10 U.S.C. § 806b(c). After trial counsel offered the Prosecution's documentary evidence in pre-sentencing, he marked as a court exhibit a one-page written unsworn statement from BH's father along with a video[15] that was attached to the exhibit.[16]

The video contained segments during which BH's parents spoke as photos displayed on the screen and music played in the background.[17] They talked about their son, his life, what he was like growing up, and how they had seen their son mature after enlisting in the Air Force and completing basic training. The video included a picture of BH's gravestone and his father inhaling as he held his son's military uniform against his face.

The Defense objected to the video, arguing that videos are not proper victim impact, and that "a video in general is not a statement" as permitted by R.C.M. 1001A.[18] The Defense further objected to the video's inclusion of various photos of BH, and that the entire presentation was accompanied by background music. As to the recorded statements from BH's parents that were interspersed throughout the video, the Defense told the military judge that it "d[id] not object to [the] statements themselves."

The military judge ruled the video was "a proper unsworn statement under R.C.M. 1001A," and allowed presentation of a slightly redacted version.[19] In regard to the video's inclusion of music and photos, the military judge found that the inclusion of these elements did not prejudice Appellant:

---

[15] The record is not clear whether BH's father presented the video in his capacity as BH's legal representative, or as a victim in his own right. The statute permits a representative to assume the Article 6b, UCMJ, 10 U.S.C. § 806b, rights of a victim who is under the age of eighteen, incompetent, incapacitated, or deceased. However, this ambiguity does not affect our analysis or decision.

[16] The military judge sustained an objection to a second video that contained notes BH took during basic training. That video was not presented to the members or challenged in this appeal.

[17] MAMMAL HANDS, MANSIONS OF MILLIONS OF YEARS, *on* ANIMALIA (Gondwana Records 2014).

[18] The Defense objected to portions of the written statement, which the military judge sustained. The members were presented a statement that was appropriately redacted.

[19] The military judge sustained Defense's objection to the video including a handwritten condolence letter that BH's parents received from their son's commander.

> As to the music, it did not have any words, it was acoustical, the court certainly recognizes that certain music can be designed or intended to evoke certain emotions of sadness or sorrow or despair. The music in this case although obviously not upbeat, the court did not find that it invokes such emotion or sadness or rage. The impact was provided, in other words, [by] the family, [and] not the music choice. Though certainly there has been no evidence here I would not expect the music itself was anyway created by the victim[.] I believe it was a neutral backdrop. There are pictures and discussions, not about the victim and how his loss or how his death impacted the family. It was not intended and will not and would not inflame the passions of the members.

The military judge then recognized this court's decision in *United States v. Hamilton*, 77 M.J. 579 (A.F. Ct. Crim. App. 2017) (en banc), *aff'd on other grounds*, 78 M.J. 335 (C.A.A.F. 2019). In *Hamilton*, we held that the probative value of R.C.M. 1001A matters are not subject to Mil. R. Evid. 403 balancing to assess any prejudicial effect they may have on the factfinder before they may be presented in court:

> Although I did not apply [Mil. R. Evid.] 403 to this evidence as the Air Force court in *Hamilton* said that [Mil. R. Evid.] 403 does not apply[, i]f I had I would have determined that the probative value of this was not substantially outweighed by the danger of unfair prejudice and I would have admitted it even if [Mil. R. Evid.] 403 did apply.

**2. Law**

A victim of an offense under the UCMJ of which an accused has been found guilty has the "right to be reasonably heard" at a sentencing hearing as allowed by Article 6b(a)(4)(B), UCMJ, 10 U.S.C. § 806b(a)(4)(B). After Congress and the President enacted Article 6b, UCMJ,[20] into law, the President promulgated R.C.M. 1001A,[21] giving specific guidance on the scope of victim impact and at the same time providing direction that a crime victim, in general terms, "has

---

[20] *See* National Defense Authorization Act for Fiscal Year 2014 (FY14 NDAA), Pub. L. No. 113-66, § 1701(a)(1) (26 Dec. 2013).

[21] *See* Exec. Order 13,696, § 1, 80 Fed. Reg. 35783, 35807–09 (22 Jun. 2015); *see also* FY14 NDAA, Pub. L. No. 113-66, § 1701(b)(1)(A) (directing that "the Secretary of Defense shall recommend to the President changes to the Manual for Courts-Martial to implement section 806b of title 10, United States Code . . . .").

the right to be reasonably heard at a sentencing hearing related to that offense." R.C.M. 1001A(a). In so doing, the President assimilated verbatim the words used in Article 6b, UCMJ. Acknowledging the President's rulemaking authority, our superior court observed, "Under the rules devised by the President to effectuate congressional intent, [(citing Article 36(a), UCMJ)] . . . the crime victim has an independent right to be reasonably heard at a sentencing hearing . . . ." *United States v. Barker*, 77 M.J. 377, 383 (C.A.A.F. 2018) (internal quotation marks omitted) (citing R.C.M. 1001A(a)); *see also id.* at 378 ("R.C.M. 1001A sets forth the rules regarding the victim's rights at presentencing, and facilitates the statutory right to 'be reasonably heard' provided by Article 6b . . . .").

Among the President's rules devised to implement congressional intent, a "crime victim" is "an individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." R.C.M. 1001A(b)(1).[22] In non-capital cases, the "right to be reasonably heard" as that phrase appears in Article 6b, UCMJ, and R.C.M. 1001A(a), "means the right to make a sworn or unsworn statement." R.C.M. 1001A(b)(4)(B); *see also* R.C.M. 1001A(e) ("unsworn statement may be oral, written, or both"). Statements presented under R.C.M. 1001A "may include victim impact or matters in mitigation." R.C.M. 1001A(c). A "[v]ictim's right to be reasonably heard" follows trial counsel's presentation of matters and precedes presentation of matters by the defense. *See* R.C.M. 1001(a)(1) (presentencing procedure).

A military judge's interpretation of Article 6b, UCMJ, and R.C.M. 1001A is a question of law reviewed de novo. *Barker*, 77 M.J. at 382 (citations omitted) (interpreting R.C.M. 1001A); *LRM v. Kastenberg*, 72 M.J. 364, 369 (C.A.A.F. 2013) (citations omitted) ("interpretation of statutes, the UCMJ, and the R.C.M., are questions of law reviewed de novo"). A military judge has a duty to evaluate an objection to a victim impact statement the same as he would evaluate evidence to determine admissibility, and "[a] military judge abuses his discretion when he admits evidence based on an erroneous view of the law." *Barker*, 77 M.J. at 383 (citations omitted). Thus, a military judge abuses his discretion when his ruling allows a factfinder to consider a victim's unsworn statement based on an erroneous view of the law, including an incorrect interpretation of Article 6b, UCMJ, and R.C.M. 1001A.

---

[22] "[V]ictim impact" is similarly defined and "includes any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

Appellant was sentenced on 22 January 2019, just over 13 months after this court issued its decision in *Hamilton*, 77 M.J. at 579,[23] on which the military judge relied in his ruling. In *Hamilton*, the appellant's trial defense counsel objected to the admission of victim impact statements on the basis that they failed to comply with R.C.M. 1001A. *Id.* at 583–84. This court held that victim impact statements offered under R.C.M. 1001A are not "evidence," and thus "the balancing test in Mil. R. Evid. 403 is inapplicable to assessing the reasonable constraints that may be placed upon such statements." *Id.* at 586. We explained,

> Mil. R. Evid. 403 addresses "legal relevance" and provides that "evidence" may be excluded notwithstanding its logical relevance. In the decision to allow a victim to exercise their right to be heard on sentencing, a military judge is neither making a relevance determination nor ruling on the admissibility of otherwise relevant evidence. Instead, the military judge assesses the content of a victim's unsworn statement not for relevance, but for scope as defined by R.C.M. 1001A.

*Id.* In *Hamilton*, we acknowledged that a military judge has an "obligation to ensure the content of a victim's unsworn statement comports with the defined parameters of victim impact or mitigation as defined by the statute and R.C.M. 1001A."[24] *Id.* at 585–86 (citing R.C.M. 1001A, Discussion ("A victim's unsworn statement should not exceed what is permitted under R.C.M. 1001A(c) . . . . Upon objection or *sua sponte*, a military judge may stop or interrupt a victim's unsworn statement that includes matters outside the scope of R.C.M. 1001A.")).

The United States Court of Appeals for the Armed Forces (CAAF) affirmed this court's *Hamilton* decision on grounds that the appellant suffered no prejudice by the fact that "[t]he victim impact statements . . . d[id] not comply with the requirements of R.C.M. 1001A[, *Manual for Courts-Martial, United States*,] (2016), and, thus, were improperly admitted." *Hamilton*, 78 M.J. at 342; *see also id.* at 342–43. Citing "the clear intent of Congress and the President" in

---

[23] We issued our en banc decision on 20 December 2017. *See United States v. Hamilton*, 77 M.J. 579 (A.F. Ct. Crim. App. 2017) (en banc), *aff'd on other grounds*, 78 M.J. 335 (C.A.A.F. 2019).

[24] Our holding was limited to the determination that victim impact statements, like an accused's unsworn statement, are not evidence: "Reading the plain language of the rules, we hold that unsworn victim impact statements offered pursuant to R.C.M. 1001A are not evidence." *Hamilton*, 77 M.J. at 583 (citing *United States v. Provost*, 32 M.J. 98, 99 (C.M.A. 1991) (if an accused elects to make an unsworn statement, he is not offering evidence)).

enacting Article 6b, UCMJ, into law, our superior court observed that "to the extent that provisions of the Military Rules of Evidence contradict the crime victim's right to be 'reasonably heard' under R.C.M. 1001A . . . the latter controls." *Id.* at 342 n.9. Consequently, the CAAF did not reach the question whether R.C.M. 1001A statements are subject to the Military Rules of Evidence. *Id.* at 342. The CAAF observed, "in those cases where a military judge complies with the detailed parameters set forth in R.C.M. 1001A (2016) and exercises sound discretion in determining whether the 'right to be reasonably heard' is exceeded, resolution of [the issue whether R.C.M. 1001A statements are subject to the Military Rules of Evidence] is unlikely to be dispositive." *Id.*

When there is error regarding the presentation of victim statements in sentencing, the test for prejudice "is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (citation omitted). When determining whether an error had a substantial influence on a sentence, this court considers the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (internal quotation marks and citation omitted).

### 3. Analysis

Appellant argues the military judge abused his discretion when he admitted the video because neither the video nor its contents complied with the requirements of R.C.M. 1001A. Noting that R.C.M. 1001A attends to sworn and unsworn *statements*, *see* R.C.M. 1001A(d)–(e), Appellant contends that the plain language of the rule does not permit videos, photos, or background music because neither is a statement. Appellant further contends these matters are outside the scope of proper victim impact that is described in R.C.M. 1001A(b)(2).

#### a. The Video and Its Contents

We find that a victim may present a verbal unsworn statement under R.C.M. 1001A through the medium of a video. Central to this conclusion is that no provision of R.C.M. 1001A expressly disallows a victim to submit a video at a sentencing hearing. Also, the video itself as a mode of presentation is neither unreasonable under R.C.M. 1001A(a), nor is it obviously outside the scope of a "statement" as that term is used in R.C.M. 1001A.

This conclusion is consistent with our reading of other provisions in the *MCM*, which lead us to conclude that a "statement" is usually afforded expansive meaning under the rules applicable to courts-martial. Notably, a video is considered a "statement" for purposes of rules that implicate a factfinder's consideration of evidence. *See United States v. Clark*, 79 M.J. 449, 454 (C.A.A.F. 2020) (concluding "any statement of the witness" under R.C.M. 914(a) includes

a videotaped interrogation); *see also United States v. Moreno*, 36 M.J. 107, 120 (C.M.A. 1992) (analyzing a videotaped interview as a hearsay statement and subject to the Confrontation Clause). Similarly, R.C.M. 702 governs depositions, and provides for both "oral or written" depositions. R.C.M. 702(c)(2). When a deposition is "oral" it must be recorded, and the military judge may allow that oral deposition to be played in court by "videotape, audiotape, or sound film." R.C.M. 703(g)(3). Read in the context of the Rules for Courts-Martial as a whole, it is evident that an "oral statement" may be introduced at a court-martial through a videotape, audiotape, or similar technological means.

While it does not appear that this court or the CAAF has addressed this question directly, in *United States v. Lovely*, an appellant attached a series of short videos to his unsworn statement. 73 M.J. 658, 675–76 (A.F. Ct. Crim. App. 2014). In addressing whether the missing videos resulted in an incomplete transcript, we implicitly assumed that the videos were properly introduced in our analysis. Similarly, in *Hamilton*, discussed *supra*, the CAAF did not take issue with the fact that one of the victim's unsworn statements was presented in court as a video recording. 78 M.J. at 335.

Here, BH's parents made out-of-court statements which were recorded by video and then presented to the members. Their chosen manner of presentation by which their own words and expressions were captured and later played for the members was comparable to an unsworn statement delivered by a declarant in narrative format in the physical presence of the factfinder. Both methods allow the members to hear and see information and give it the weight it is due. We find the military judge did not abuse his discretion in finding that a video is within the scope of an unsworn victim impact statement presented under R.C.M. 1001A.

Turning to the contents of the video that were objected to here, we find that photos of BH depicting his life, which were interspersed throughout the video, could reasonably convey the loss suffered by him, his family, and his community, as a direct result of Appellant's actions. It has long been recognized that a court-martial "can only make intelligent decisions about sentences when they are aware of the full measure of loss suffered by all of the victims, including the family and the close community." *United States v. Pearson*, 17 M.J. 149, 153 (C.M.A. 1984). "Victims of a murder are not faceless individuals." *Curtis*, 44 M.J. at 140; *see also United States v. Taylor*, 41 M.J. 701, 705 (A.F. Ct. Crim. App. 1995) (upholding ruling to admit victim's Air Force training photo in sentencing, finding that it reminded members that "just as the murderer should be considered as an individual, so too the victim is an individual whose death presents a unique loss to society and particularly to his family"). The background music that accompanied the video, including the pictures, is unusual

but it is not obviously unreasonable in light of a crime victim's right to be reasonably heard under Article 6b(a)(4)(B), UCMJ, and R.C.M. 1001A(a), as might constitute an abuse of discretion by the military judge in allowing the objected-to contents of the video to be presented to the factfinder.

### b. Test for Prejudice

Even if we assume for purposes of our analysis that the military judge erred, it is unnecessary to the resolution of this appeal to decide if the contents of the video unsworn statement that included pictures accompanied by background music are beyond the scope of R.C.M. 1001A. It is also unnecessary to decide whether something other than speech or written words exceed the parameters of specific kinds of victim impact listed in R.C.M. 1001A(b)(2), which flank a victim's statutory right to be reasonably heard that the President repeated in R.C.M. 1001A(a). This is because we find no prejudice in the presentation of the unsworn statement at Appellant's sentencing hearing even if the military judge abused his discretion in failing to exclude the objected-to contents of the video presentation as beyond the scope of Article 6b, UCMJ, and R.C.M. 1001A, and thus improper. Consequently, we need not decide whether photographs or background music are a statement, and whether they convey proper victim impact, on the one hand, or if exclusion of these matters would be contrary to the right of a crime victim to be "reasonably heard" under Article 6b, UCMJ, and R.C.M. 1001A(a), on the other.

Turning to prejudice, the test "'is whether the error substantially influenced the adjudged sentence.'" *Barker*, 77 M.J. at 384 (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). Here, there was exceptionally strong aggravation evidence considering the unprovoked violence that preceded the killing as well as the impact of Appellant's crime on BH's family and friends. Appellant's case was comparatively weak. Appellant introduced five character letters, a letter of appreciation, and photos that portrayed him positively. Appellant presented more compelling evidence in the form of a video presentation containing statements by Appellant's family and family photos.[25] Appellant called two witnesses: his father, and a confinement guard who testified that he was not a disciplinary issue in pretrial confinement.

The materiality and quality of the objected-to portions of the video presentation were eclipsed by the evidence presented on the merits and in aggravation. In sentencing, the Prosecution had already introduced photos of BH taken

---

[25] The Defense presented a video that contained statements by Appellant's family interspersed with family photos. That exhibit focused on Appellant's positive upbringing and his good character before enlisting in the Air Force.

before his murder, so inclusion of additional photos in the video was not prejudicial.[26] Appellant's mother and father testified in the Government's case, so the panel was aware of the loss they suffered when their son died and could assess their demeanor and credibility under oath. The Defense did not object to the recorded statements from BH's parents that were interspersed throughout the video, which provided meaningful information about the impact of their son's murder on their family and community. The military judge concluded that the music that accompanied the video would not cause an emotional outpouring from the members. We agree and find the music was not "unduly emotional," *People v. Montes*, 320 P.3d 729, 787 (Cal. 2014), and did not distract the members from the task of meting out a fair sentence because it had neither probative nor prejudicial value.[27] We find that the complained-of contents of the video were not of such materiality or quality to support a finding of prejudice in light of all the evidence and the written unsworn victim impact statements that were properly allowed under R.C.M. 1001A.

"An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Barker*, 77 M.J. at 384 (citing *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007)). As a whole, the video provided insight into the impact of murder on the lives of the parents whose son Appellant intentionally killed. Although the photographs and accompanying music (included with the unobjected-to voice-over statements) helped explain his parents' very personal loss to the members, we find it did not provide new ammunition that "substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384. The maximum sentence available in this case included confinement for life without the possibility of parole, and yet Appellant received 35 years.

---

[26] The Government displayed approximately 24 images admitted in sentencing as Prosecution Exhibit 24 and had BH's parents discuss these pictures during their sworn testimony.

[27] Notwithstanding a victim's right to be reasonably heard, a military judge has the responsibility to "[e]nsure that the dignity and decorum of the proceedings are maintained," and shall "exercise reasonable control over the proceedings." R.C.M. 801(a)(2)–(3); *LRM v. Kastenberg*, 72 M.J. 364, 372 (C.A.A.F. 2013) (victim's "right to a reasonable opportunity to be heard on factual and legal grounds" is "subject to reasonable limitations and the military judge retains appropriate discretion under R.C.M. 801").

**E. Sentence Severity**

Appellant claims that the circumstances surrounding BH's death do not warrant 35 years confinement and asks that his sentence be reduced by at least 20 years. For support, Appellant's counsel advocates in this appeal that the killing was "an unplanned and tragic response to unwanted sexual contact."[28] There may be some doubt whether Appellant's killing BH was planned, but in line with the verdict it cannot be said that Appellant's stabbing and cutting BH's throat with a knife was unintended. Under the circumstances here where death was the obvious conclusion to Appellant's actions, we are not persuaded that the sentence adjudged by the members for unpremeditated murder is inappropriately severe.

This court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). While we have great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

The maximum term of confinement for Appellant's murder conviction was life without the possibility of parole. Appellant was sentenced to 35 years. Evidence at trial showed that Appellant used overwhelming force to kill his roommate at a deployed location. The reason Appellant gave for his rapid onset of violence is as unconvincing as it is extreme.[29] In light of the cruelty and intensity Appellant showed in beating and then stabbing and cutting a fellow Airman in their shared quarters, the victim impact evidence that was properly admitted at trial and in sentencing, the comparatively slight evidence in mitigation and extenuation, and—importantly—evidence of Appellant's senseless

---

[28] Appellant testified he "woke up to [BH]'s hand on [his] butt." The suggestion that BH's conduct before his murder was sexual, or that it was intentional as opposed to accidental, is not conclusive from Appellant's testimony or other evidence in the record.

[29] To be clear, we do not reach the question of the mendacity of Appellant's findings testimony. *See*, *e.g.*, *United States v. Sills*, 61 M.J. 771, 776 (A.F. Ct. Crim. App. 2005) (considering mendacity on findings, especially the appellant's effort to describe his stepdaughter as a sexual aggressor for its bearing on potential for rehabilitation, and whether the approved sentence is inappropriately severe). We do not resolve whether Appellant testified truthfully, only that the explanation he gave for killing BH does not render his sentence inappropriately severe.

impulse that he could kill his roommate in the middle of the night and then succeeding in that grim prediction, we find the sentence is not inappropriately severe.

We have given individualized consideration to Appellant, the nature and seriousness of his offenses, his record of service, and all other matters contained in the record of trial. Understanding we have a statutory responsibility to affirm only so much of the sentence that is correct and should be approved, Article 66(c), UCMJ, we determine to affirm the sentence in our decree.

## F. Timeliness of Appellate Review

### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due

process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

### 2. Analysis

Appellant's case was originally docketed with the court on 31 May 2019. The overall delay in failing to render this decision within 18 months is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy appellate review. The reasons for the delay include the time required for Appellant to file his brief on 24 August 2020, and the Government to file its answer on 28 September 2020. Analyzing the *Barker* factors, we find the delay is not excessively long. This court granted 13 enlargements of time—12 for Appellant and 1 for the Government—for appellate counsel to prepare briefs in support of the assignments of error, issues raised by Appellant, and the Government's answer. The number of issues that are addressed in the briefs, and the enlargements of time, reflect the complexity of the case, which includes 1,110 pages of trial transcript, 26 prosecution exhibits, several of which contain multiple images, 15 defense exhibits, and 64 appellate exhibits.

The court affirms the findings and sentence in this case after examining numerous assertions of error that Appellant claims occurred at trial and sentencing. However, Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id.* In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court